FILED

2023 Aug-29  PM 03:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| CARRIE GILLILAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  2:22-cv-01000-HNJ |
| | ) | |
| COMMISSIONER, SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Carrie Gilliland seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding her claim for a period of disability and disability insurance benefits.  The undersigned carefully considered the record, and for the reasons expressed herein, the court **REVERSES** the Commissioner's decision and **REMANDS** for further consideration of the medical opinions addressing Gilliland's mental impairments, and for further assessment of Gilliland's satisfaction of Listings 12.04 and 12.15.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment.  (Doc. 15).

Security Act and the Regulations promulgated thereunder.  The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).  To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4).  The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11ᵗʰ Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity.  20 C.F.R. § 404.1520(b).  Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at § 404.1520(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part

2

404, Subpart P, App. 1, §§ 1.00-114.02. *Id.* at § 404.1520(d).  If a claimant's impairment meets the applicable criteria at this step, that claimant's impairment would prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525.  That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment.  *See Williams v. Astrue,* 416 F. App'x 861, 862 (11ᵗʰ Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience." (citing 20 C.F.R. §§ 404.1520, 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11ᵗʰ Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work.  20 C.F.R. § 404.1520(e).  At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work.  *See id.* § 404.1520(a)(4)(iv).  If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled.  *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work.  *Id.*

§ 404.1512(b)(3), 404.1520(g).  If the claimant can perform other work, the evaluator will not find the claimant disabled.  *See id.* § 404.1520(a)(4)(v); *see also id.* § 404.1520(g). If the claimant cannot perform other work, the evaluator will find the claimant disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards.  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).  The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'"  *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). Indeed, "an ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence.'"  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) (citing 42 U.S.C. § 405(g)). Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ.  "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence . . . . is 'more than a mere scintilla,' . . . [and] means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Biestek*, 139 S. Ct. at 1154 (citations omitted).  Therefore, substantial evidence exists even if the evidence

preponderates against the Commissioner's decision.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Ms. Gilliland, age 45 at the time of the ALJ hearing, protectively filed an application for a period of disability and disability insurance benefits on October 31, 2018, alleging disability as of April 13, 2018.  (Tr. 47, 244-45).  The Commissioner denied her claims, and Gilliland timely filed a request for hearing.  (Tr. 140-46, 149-50).  An ALJ held a hearing on August 4, 2021.  (Tr. 47-75).  The ALJ issued an opinion on August 23, 2021, denying Gilliland's claim.  (Tr. 12-41).

Applying the five-step sequential process, the ALJ found at step one that Gilliland did not engage in substantial gainful activity after April 13, 2018, her alleged disability onset date.  (Tr. 17).  At step two, the ALJ found Gilliland manifested the severe impairments of bipolar disorder, posttraumatic stress order (PTSD), obesity, mild degenerative disc disease of the cervical spine with moderate stenosis, degenerative changes of the lumbar spine, degenerative changes of the right knee and left shoulder, right shoulder surgery, and left carpal tunnel syndrome.  (*Id.*)  At step three, the ALJ found that Gilliland's impairments, or combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 19).

Next, the ALJ found that Gilliland exhibited the residual functional capacity ("RFC") to perform sedentary work, with the following additional limitations:

[S]he can occasionally climb ramps and stairs, stoop and crouch. She should never climb ladders, ropes or scaffolds, kneel or crawl. She can frequently handle and finger with her bilateral upper extremities. She can occasionally reach overhead with her dominant right upper extremity. She should have no excessive vibration or work in extreme cold. She should have no exposure to hazards such as unprotected heights and hazardous machinery. She would be able to perform, remember and carry-out simple, routine repetitive tasks consistent with unskilled work in an environment where there are only occasional work place changes. She can have occasional work related interaction with supervisors, co-workers, and the general public. She would need a sit stand option with the ability to alternate between sitting and standing every hour for up to 3 minutes while remaining on task. She would require the use of an assistive device for ambulation, however, not for standing. She cannot work around uneven terrains or be required to use her lower extremities for pushing of leg controls.

(Tr. 22).

At step four, the ALJ determined Gilliland did not retain the ability to perform her past relevant work as a sales attendant and receptionist. (Tr. 38-39). At step five, the ALJ determined that, considering Gilliland's age, education, work experience, and RFC, a significant number of other jobs exist in the national economy that she can perform. (Tr. 39-40). Accordingly, the ALJ determined Gilliland has not suffered a disability, as defined by the Social Security Act, since April 13, 2018. (Tr. 40).

Gilliland timely requested review of the ALJ's decision. (Tr. 242-43). On June 8, 2022, the Appeals Council denied review, which deems the ALJ's decision as the Commissioner's final decision. (Tr. 1-6). On August 9, 2022, Gilliland filed her complaint with the court seeking review of the ALJ's decision. (Doc. 1).

## ANALYSIS

In this appeal, Gilliland argues the ALJ failed to consider her right carpal tunnel syndrome as a severe impairment, improperly evaluated the medical opinion evidence, and failed to find her disabled pursuant to Listings 12.04 and 12.15. For the reasons discussed below, the undersigned concludes Gilliland's second and third arguments warrant remand to the Commissioner for further consideration, but only as to Gilliland's mental condition.

## I.   The ALJ Did Not Err In Declining to Deem Gilliland's Right Carpal Tunnel Syndrome a Severe Impairment

As discussed regarding step two of the sequential evaluation process, the ALJ found Gilliland manifested the severe impairments of bipolar disorder, posttraumatic stress order (PTSD), obesity, mild degenerative disc disease of the cervical spine with moderate stenosis, degenerative changes of the lumbar spine, degenerative changes of the right knee and left shoulder, right shoulder surgery, and left carpal tunnel syndrome. (Tr. 17). Gilliland argues the ALJ should also have adjudged her right carpal tunnel syndrome as a severe impairment.

Step two of the sequential evaluation process, during which the ALJ considers the medical severity of a claimant's impairments, constitutes a "'threshold inquiry' and 'allows only claims based on the most trivial impairments to be rejected.'" *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1265 (11th Cir. 2019) (citing *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004), *superseded on other grounds by* 20 C.F.R. § 404.1520c.;

*McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986)).

An impairment or combination of impairments manifests as "not severe" if it "does not significantly limit [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1522(a).  The term "basic work activities" refers to "the abilities and aptitudes necessary to do most jobs," including:

(1)    Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2)    Capacities for seeing, hearing, and speaking;

(3)    Understanding, carrying out, and remembering simple instructions;

(4)    Use of judgment;

(5)    Responding appropriately to supervision, co-workers and usual work situations; and

(6)    Dealing with changes in a routine work setting.

*Id.* § 404.1522(b).  Thus, an ALJ should characterize an impairment as non-severe "only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience."  *Schink,* 935 F.3d at 1265 (citing *McDaniel*, 800 F.2d at 1031).

The ALJ observed that Gilliland underwent a right carpal tunnel release, right trigger finger release, and right ulnar nerve release in March 2018.  Even so, she did not characterize Gilliland's right-hand impairments as severe because the record contained "no evidence of residual symptoms related to these procedures." (Tr. 18).  That finding significantly affected the ALJ's decision to find Gilliland not disabled, as the ALJ

8

concluded Gilliland could frequently handle and finger with both upper extremities, and any further limitations on her ability to use her hands could limit her ability to work at the sedentary level. *See* SSR 96-9P, 1996 WL 374185, at *8 ("Any *significant* manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base.") (emphasis in original).

Gilliland contests the ALJ's finding, as she asserts her right-hand symptoms persisted even after the right hand release procedure on March 27, 2018.  (Tr. 456). However, to support that argument, she cites only evidence predating the release procedure.  (Doc. 12, at 18; Tr. 447-49, 458-60, 1340-43).

Post-procedure evidence indicates Gilliland's symptoms improved substantially. On April 11, 2018, Dr. Maddox, the surgeon, stated Gilliland was "doing well"; she experienced minimal pain; and her nocturnal symptoms had largely resolved.  Dr. Maddox continued Gilliland's five-pound lifting restriction, and he prescribed home exercises and occupational therapy.  (Tr. 450).  On May 17, 2018, Gilliland presented with no complaints, and Dr. Maddox stated she was "doing very well."   The examination of her right wrist and elbow revealed "definite improvement with no new problems or positive findings."   She could continue all activities as tolerated and only needed to follow up if she experienced pain or other symptoms.  (Tr. 454).  The record does not reflect Gilliland returned to Dr. Maddox after May 17, 2018.

On December 12, 2019, Gilliland reported to Dr. Berke, her pain management physician, that she experienced arm pain, numbness, and tingling. She reported dropping objects and trouble sleeping due to pain, but she denied weakness. However, those symptoms presented only in her left arm, not her right arm. (Tr. 1982-86). Finally, during the administrative hearing, Gilliland testified she enjoyed good range of motion in her right wrist after the surgery. (Tr. 66).

These records do not demonstrate Gilliland's right carpal tunnel syndrome continued to cause limitations in her ability to perform work activities after the March 2018 surgery. Thus, substantial evidence supports the ALJ's finding that Gilliland's right carpal tunnel syndrome did not cause a severe impairment. *See Freeman v. Comm'r, Soc. Sec. Admin.*, 593 F. App'x 911, 914 (11th Cir. 2014) ("Mr. Freeman has not cited to any medical evidence showing that his back pain significantly limits his ability to perform work activities.").

## II. The ALJ Appropriately Considered the Medical Opinions Addressing Gilliland's Physical Functioning, Yet She Did Not Appropriately Consider the Medical Opinions Addressing Gilliland's Mental and Psychological Functioning

Gilliland also argues the ALJ improperly considered certain medical opinion evidence. Under the regulatory framework applicable to Gilliland's claim,[2] the ALJ

---

[2] On January 18, 2017, the Commissioner revised the regulations governing the assessment of medical opinion evidence for claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5867 (Jan. 18, 2017) (codified at 20 C.F.R. § 404.1520c). Gilliland's claims, filed on October 31, 2018, fall under the revised regulations.

"will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). The ALJ must apply the same factors in the consideration of all medical opinions and administrative medical findings, rather than affording specific evidentiary weight to any particular provider's opinion. *Id.*

Supportability and consistency constitute the most important factors in any evaluation, and the ALJ must explain the consideration of those factors. *Id.* § 404.1520c(b)(2). Thus, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s)," and "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources[,] the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1)-(2).

The ALJ also may consider the medical source's specialty and the relationship between the claimant and the medical source, including the length, purpose, and extent of the treatment relationship, and the frequency of examinations. *Id.* § 404.1520c(c)(3)-(5). The ALJ "may" conclude that an examining medical source will understand the claimant's impairments better than a medical source who only reviews evidence in the claimant's file. *Id.* § 404.1520c(c)(3)(v). The ALJ also "will consider other factors that tend to support or contradict a medical opinion or prior administrative medical

finding," including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* § 404.1520c(c)(5).

In addition, "[t]he opinions of agency [medical or] psychological consultants may be considered medical opinions, and their findings and evidence are treated similarly to the medical opinion of any other source." *Gordon v. Saul*, No. 8:18-CV-829-T-SPF, 2019 WL 4254470, at *5 (M.D. Fla. Sept. 9, 2019) (citing 20 C.F.R. § 404.1513a(b)).[3]

## A.    The ALJ Appropriately Considered Medical Opinions Addressing Gilliland's Physical Functioning

Gilliland argues the ALJ improperly found the medical opinion evidence concerning her physical conditions, and particularly the opinions of Drs. Berke and Manes, unpersuasive, as those physicians' "opinions are consistent with Ms. Gilliland's history of chronic pain which has not resolved despite treatment," and with medical records documenting antalgic gait, use of a cane to ambulate, shoulder tenderness, decreased range of shoulder motion, bilateral knee tenderness and crepitus with range of motion, back and neck tenderness and decreased range of motion, and positive straight leg raise tests bilaterally.   (Doc. 12, at 24).   As discussed herein, though Gilliland's records portray a history of those symptoms and limitations, substantial

---

[3] "A medical consultant is a member of a team that makes disability determinations in a State agency . . . , or who is a member of a team that makes disability determinations for [the SSA] when [the SSA] make[s] disability determinations." 20 C.F.R. § 404.1616(a).   "The medical consultant completes the medical portion of the case review and any applicable residual functional capacity assessment about all physical impairment(s) in a claim." *Id.*

evidence nevertheless supports the ALJ's decision that the medical evidence did not support the existence of disabling impairments.

### 1.     Dr. Matthew Berke's May 21, 2018, and October 11, 2018, Letters

Dr. Matthew Berke, Gilliland's pain management physician at Southside Pain Specialists, submitted letters dated May 21, 2018, and October 11, 2018, stating: "I do not feel [Gilliland] could tolerate work as a secretary due to her lumbar degenerative disc disease which will not allow prolonged sitting." (Tr. 1282-84). The ALJ observed that Dr. Berke's statements addressed "an issue reserved to the Commissioner." In addition, Dr. Berke's opinion did not persuade the ALJ because "the opinion is not found to be consistent with the medical evidence, and the evidence does not support [Dr. Berke's] conclusion that [Gilliland] would be unable to perform work at the sedentary level." (Tr. 35).

The ALJ rightfully refuted Dr. Berke's statements about Gilliland's ability to work. As the Eleventh Circuit recently reiterated:

> An administrative law judge is not required to agree with the statement of a medical source that a claimant is "disabled" or "unable to work." 20 C.F.R. § 404.1527(d)(1). Whether a claimant meets the statutory definition of disability is an administrative finding, not a medical opinion. That administrative finding is "reserved to the Commissioner." *Id.* § 404.1527(d). And because the Commissioner has delegated his authority to make the finding at the hearing level to an administrative law judge, the finding is effectively reserved to the administrative law judge. *See id.* § 404.1546(c). A medical source's opinion that a claimant is "disabled" or "unable to work" is not dispositive of a disability claim because the determination is reserved to an administrative

law judge acting on behalf of the Commissioner. *Id.* § 404.1527(d)(1). *Walker v. Soc. Sec. Admin., Comm'r*, 987 F.3d 1333, 1338-39 (11th Cir. 2021).

Moreover, substantial evidence supports the ALJ's findings regarding the supportability and consistency of Dr. Berke's opinion.  Gilliland asserts Dr. Berke's opinion stands "consistent with Ms. Gilliland's history of chronic pain which has not resolved despite treatment."  (Doc. 12, at 24).  Her brief points to clinical findings of antalgic gait, use of a cane to ambulate, tenderness and decreased range of shoulder motion, tenderness and crepitus with range of motion in her knees, tenderness and decreased range of motion in her neck and back, and positive straight leg raise tests bilaterally.  (*Id.*).  Reviewing the record as a whole, the court concludes Dr. Berke's treatment notes and other substantial evidence support the ALJ's decision to find Dr. Berke's opinion non-persuasive, and the ALJ's conclusion that Gilliland can perform work at the sedentary level.[4]

On February 20, 2018, Gilliland complained to Dr. Berke of level-four neck and shoulder pain. Dr. Berke noted Gilliland used a cane to ambulate, experienced tenderness and decreased range of motion in her cervical and lumbar spine and finger, and displayed decreased nerve sensation in two toes.  However, she displayed normal

---

[4] The court observes Dr. Berke mentioned only Gilliland's lumbar degenerative disc disease and her resulting inability to sit, yet the ALJ rendered a broader assessment about Gilliland's inability to perform any work at the sedentary level.  Therefore, the court will assess Gilliland's arguments about evidence addressing the totality of her condition, not just evidence regarding her lumbar degenerative disc disease.

muscle bulk and tone.  Dr. Berke encouraged Gilliland to increase exercise.  (Tr. 1045-49, 1393-97).

On March 15, 2018, Gilliland reported to Dr. Poczatek at Neurological Associates – Birmingham that she experienced level-seven neck pain with radiation to the upper extremities, bilateral hand numbness, and paresthesias.  Her cervical pain increased with rotation, side bending, and extension.  The physical examination revealed mildly antalgic gait, tenderness and decreased range of motion in the cervical spine, and no clubbing or edema.  Dr. Poczatek assessed right wrist neuropathy consistent with carpal tunnel syndrome and mild irritability at the C5 nerve root.[5]  (Tr. 1330-36).

On May 15, 2018, Gilliland complained to Dr. Berke of level-five neck and shoulder pain and reduced range of motion. Dr. Berke's examination detected obesity, use of a cane to ambulate, tenderness and reduced range of motion in the shoulder and lumbar and cervical spine, decreased sensation in two toes, and normal muscle bulk and strength.  (Tr. 1039-43, 1387-91).

On May 17, 2018, Gilliland visited Dr. Martin at OrthoSports Associates for shoulder pain.  Her symptoms worsened since her previous visit, but she reported only moderate pain at level five of ten.  The clinical examination produced pain and limited motion and rotation in her shoulder.  X-rays demonstrated some degenerative changes but no other abnormalities.  Dr. Martin assessed possible shoulder impingement

---

[5] As previously discussed, Gilliland's carpal tunnel syndrome did not present a severe impairment, as her symptoms substantially resolved after surgery.

syndrome and possible frozen shoulder.  He prescribed oral steroids.  (Tr. 1329-30).

On July 13, 2018, Gilliland complained to Dr. Manes, her primary care physician, of difficulty hearing, frequent nosebleeds, snoring, dry mouth, shortness of breath when walking, sleep apnea, muscle aches, muscle weakness, joint pain, back pain, extremity swelling, restless legs, depression, sleep disturbances, restless sleep, easy bruising, runny nose, and sinus pressure.  The examination revealed no acute distress, normal ambulation, good judgment, alertness, full orientation, intact memory, normal neck, normal lungs, normal motor strength, normal gait and station, intact cranial nerves, and no tremors.  Dr. Manes continued Gilliland's medications and advised her to reduce her weight with diet and exercise.  (Tr. 1190-92).

On August 13, 2018, Dr. Berke observed Gilliland used a cane to ambulate; she displayed tenderness and decreased range of motion in her shoulder and cervical and lumbar spine; and she presented a positive straight leg raise test bilaterally.  Gilliland reported level-six pain, as medications controlled her lower back, neck, and shoulder pain, and she displayed normal motor strength. Dr. Berke encouraged Gilliland to increase exercise.  (Tr. 1033-37, 1381-85).

On September 27, 2018, Dr. Berke administered a trigger point injection in Gilliland's cervicothoracic region.  (Tr. 1377-79).

On January 30, 2019, Gilliland saw a nurse practitioner in Dr. Manes's office. She complained of elevated blood pressure, nose and sinus problems, congestion, and depression.  The examination revealed no acute distress, normal ambulation, good

judgment, alertness, full orientation, intact memory, normal neck, normal motor strength, normal gait and station, intact cranial nerves, and no tremor. The nurse practitioner treated Manes for acute bronchitis. (Tr. 1184-87).

On January 31, 2019, Gilliland reported to Dr. Berke level-six shoulder, knee, neck, and lower back pain. She displayed antalgic gait and tenderness and reduced range of motion in her shoulder and cervical and lumbar spine, and she presented a positive straight leg raise test bilaterally. She possessed full muscle strength. (Tr. 1256-60, 1371-75).

On April 22, 2019, Gilliland reported to Dr. Berke level-six shoulder, knee, neck, and lower back pain. Her medication regimen controlled her pain. She did not follow up with an orthopedic referral for her shoulder, as her shoulder pain had stabilized. She demonstrated antalgic gait and tenderness and reduced range of motion in her shoulder and cervical and lumbar spine, yet she possessed full muscle strength. (Tr. 1250-54, 1365-69).

On June 17, 2019, Gilliland reported to Dr. Berke level-eight shoulder, knee, neck, and lower back pain. She demonstrated antalgic gait and tenderness and decreased range of motion in her shoulder and cervical and lumbar spine, yet she possessed full muscle strength. (Tr. 1359-63).

On June 25, 2019, Gilliland presented to Dr. Manes desiring to discuss "getting on Social Security for bipolar, panic attacks, depression, sleep apnea, [degenerative disc disease, and] enthesopathy" of the neck. (Tr. 1961). She reported back pain that

increased upon standing and exercise but improved with lying down, and sciatica in her lateral thigh on both sides to the knees.  She received epidural pain treatment in the past, but it provided only temporary relief.  She has received a diagnosis of bipolar disorder, and she experiences depression, anxiety, decreased need for sleep, restlessness, irritability, agitation, inability to concentrate, loss of energy, excessive crying, difficulty making decisions, and suicidal ideation.  The clinical examination revealed moderate distress; limited ambulation, in that Gilliland slowly sat on and arose from the examination table; good judgment; anxiety; depression; crying; full orientation; normal memory; limited neck range of motion with pain; and 4/5 bilateral lower extremity strength.  Dr. Manes did not render findings regarding Gilliland's gait or her range of motion in other joints.  (Tr. 1961-64).

On July 15, 2019, Gilliland presented to Dr. Manes complaining of right foot pain around the big toe.  The clinical examination revealed obesity, limited ambulation due to foot pain, very flattened affect to the point of appearing medicated, and increased dry cough.  Dr. Manes suspected Gilliland suffered from gout.  (Tr. 1957-60).

 On August 8, 2019, Dr. Berke administered a trigger point injection in Gilliland's cervicothoracic region.  (Tr. 1355-57).

On September 6, 2019, Gilliland reported to Dr. Manes back pain that worsened upon standing and exercise but abated with lying down, and sciatica in the lateral thigh on both sides to the knees.  She also reported mental symptoms including anxiety, decreased need for sleep, restlessness, irritability, agitation, inability to concentrate, loss

of energy, excessive crying, difficulty making decisions, and suicidal ideation. The examination revealed obesity; moderate distress; limited ambulation, in that Gilliland slowly sat on and arose from the examination table; good judgment; anxious and depressed mood with some crying; full orientation; intact memory; pain, tenderness, and limited range of motion in the neck; 4/5 bilateral lower extremity motor strength; back tenderness; and positive straight leg raise tests bilaterally. Dr. Manes assessed essential hypertension, gout, bipolar disorder, mixed hyperlipidemia, and obesity. Dr. Manes did not issue findings regarding Gilliland's gait or her range of motion in other joints. (Tr. 1952-57).

On September 12, 2019, Gilliland reported to Dr. Berke level-five lower back pain with no radiation. She displayed antalgic gait, tenderness and decreased range of motion in her knees and lumbar and cervical spine, yet she produced a negative straight leg raise test, and she possessed full muscle strength. (Tr. 1998-2002).

On October 24, 2019, Gilliland reported to Dr. Berke level-seven pain in her lower back, bilateral knees, and neck, with radiation into her shoulders. She displayed antalgic gait and tenderness and decreased range of motion in her knees and lumbar and cervical spine, yet she produced a negative straight leg raise test, and she possessed full muscle strength. (Tr. 1992-96).

On December 12, 2019, Gilliland reported to Dr. Berke level-seven pain in her lower back, knees, and neck that reduced to level four with medication. The pain radiated from her neck into her left upper extremity, causing numbness and tingling.

The pain also interfered with her sleep and caused her to drop objects.  During the examination, she displayed antalgic gait and tenderness and reduced range of motion in her knees and cervical and lumbar spine, yet she produced a negative straight leg raise test, and she possessed full muscle strength.  Dr. Berke administered an injection for pain in Gilliland's right knee. (Tr. 1982-90).

On December 19, 2019, Gilliland presented to Dr. Manes with weight gain, muscle aches, joint pain, back pain, depression, restless sleep, and fatigue.  The examination revealed obese appearance; moderate distress; limited ambulation, in that Gilliland slowly sat on and arose from the examination table; good judgment; anxious and depressed mood with some crying; full orientation; intact memory; pain and tenderness with limited range of motion in the neck; 4/5 bilateral lower extremity motor strength; normal neurological examination; lower back tenderness; and positive straight leg raise tests bilaterally.  Dr. Manes did not render findings regarding Gilliland's gait or her range of motion in other joints.  (Tr. 1948-52).

On January 25, 2020, Gilliland reported to Dr. Berke level-seven pain in her lower back, knees and neck.  The pain radiated into Gilliland's right upper extremity, but it did not radiate into her legs.  The examination revealed obesity, antalgic gait, and tenderness and reduced range of motion in her knees and cervical and lumbar spine, yet she produced a negative straight leg raise test, and she possessed full muscle strength.  (Tr. 2055-59).

On May 18, 2020, Gilliland reported to Dr. Berke level-six pain in her lower back, neck, and left knee.  The pain radiated into Gilliland's right upper extremity, but it did not radiate into her legs.  The examination revealed obesity, antalgic gait, and tenderness and reduced range of motion in her knees and cervical and lumbar spine, yet she produced a negative straight leg raise test, and she possessed full muscle strength.  (Tr. 2093-98, 2146-48).

On June 27, 2020, Dr. Manes treated Gilliland by telephone due to the Covid-19 pandemic.  She reported possible Covid exposure, but she did not display any symptoms or lodge any additional complaints. (Tr. 2152-56).

On July 28, 2020, Gilliland reported to Dr. McKnight, a practice partner of Dr. Berke, pain in her lower back, neck, and left knee.  She assessed her pain level at the time of the appointment at seven, but the pain approached level nine at its highest and diminished to level four with medication.  The examination revealed obesity, antalgic gait, and tenderness and reduced range of motion in her knees and cervical and lumbar spine, yet she produced a negative straight leg raise test, and she possessed full muscle strength.  (Tr. 2088-92, 2137-39).

As Gilliland argues, these records include clinical findings of antalgic gait; cane usage; tenderness and decreased range of motion in the shoulder, neck, back, and knee joints; and positive straight leg raise tests.  However, those findings do not necessarily equate to functional limitations that would preclude full-time work.  *See Moore,* 405 F.3d at 1213 n.6 (citing *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986)) ("To a large

extent, Moore questions the ALJ's RFC determination based solely on the fact that she *has* varus leg instability and shoulder separation.  However, the mere existence of these impairments does not reveal the extent to which they limit her ability to work or undermine the ALJ's determination in that regard.") (emphasis in original); *Mansfield v. Astrue*, 395 F. App'x 528, 531 (11th Cir. 2010) (diagnosis insufficient to establish disability); *Osborn v. Barnhart*, 194 F. App'x 654, 667 (11th Cir. 2006) (While a doctor's letter reflected diagnoses, "it does not indicate in any way the limitations these diagnoses placed on [the claimant's] ability to work, a requisite to a finding of disability.").

Moreover, the court must assess not whether some evidence supports the medical assessments, including Dr. Berke's, that impose disabling limitations, but whether substantial evidence supports the ALJ's decision to find the opinions unpersuasive.  *Moore*, 405 F.3d at 1213 (quoting *Bloodsworth,* 703 F.2d at 1239) ("To the extent that Moore points to other evidence which would undermine the ALJ's RFC determination, her contentions misinterpret the narrowly circumscribed nature of our appellate review, which precludes us from 're-weigh[ing] the evidence or substitut[ing] our judgment for that [of the Commissioner] . . . even if the evidence preponderates against' the decision.") (alterations in original).

Though Gilliland consistently complained of pain, her complaints encompassed her neck, shoulders, back, and knees.  In contrast, Dr. Berke imposed limitations related only to Gilliland's lumbar spine pain.  In addition, the level of Gilliland's pain in all those joints varied, but it typically ranged from level four to level six, at least with

medication, indicating only moderate pain. Indeed, of the 14 occasions on which Gilliland ranked her pain to her physicians on a ten-point scale, she reported level-eight pain on one occasion and level-seven pain on five occasions, and on two of the occasions on which she reported level-seven pain, she stated the level decreased to four with medication. *See* 20 C.F.R. § 404.1529(c)(3)(iv) (Commissioner should consider the effectiveness of a claimant's medications in assessing the claimant's symptoms). Gilliland's consistent reports of only moderate pain, with only a few exceptions when the pain exceeded the moderate level, support the ALJ's decision not to find Dr. Berke's assessment of disabling limitations fully persuasive.

Gilliland's arguments about treatment notes discussing cane usage carry little weight, as the ALJ's RFC finding encompassed a need to use a cane for ambulation. In any event, Dr. Berke noted Gilliland's cane usage on only three occasions, the last of which occurred on August 13, 2018, and neither he nor any other physician prescribed a cane.

Findings regarding antalgic gait bear less relevance to the ALJ's consideration of Dr. Berke's opinion, as Dr. Berke imposed limitations on Gilliland's ability to sit for prolonged periods, not her ability to stand or walk. Moreover, though Dr. Berke consistently assessed Gilliland as displaying antalgic gait, Dr. Poczatek identified only mildly antalgic gait, and Dr. Manes either assessed normal gait or did not mention gait at all. Therefore, the record contains mixed findings regarding antalgic gait.

As to the straight leg raise test, Gilliland received positive results on four

23

occasions (August 13, 2018; January 31, 2019; September 6, 2019; and December 19, 2019), but she received negative results on six occasions (September 12, 2019; October 24, 2019; December 12, 2019; January 25, 2020; May 18, 2020; and July 28, 2020). The higher occurrence of negative results provides substantial evidentiary support for the ALJ's decision not to find Dr. Berke's opinion regarding the functional effects of Gilliland's lumbar impairments fully persuasive.

Gilliland's providers consistently noted decreased range of motion in her shoulder, cervical and lumbar spine, and knees, yet they also noted Gilliland possessed full or only slightly reduced muscle strength. Taken as a whole, this evidence does not undermine the substantial evidence supporting the ALJ's decision not to find Dr. Berke's opinion regarding Gilliland's ability to sit fully persuasive. Moreover, the ALJ's RFC finding included a limitation of occasional reaching overhead with the dominant right upper extremity, which could accommodate the limited range of shoulder motion.

In summary, though some evidence supports Dr. Berke's opinion Gilliland could not perform prolonged sitting, substantial evidence, as described in this section, supports the ALJ's decision to find Dr. Berke's opinion less than fully persuasive, and to conclude Gilliland can perform a limited range of sedentary work. The ALJ did not err in evaluating Dr. Berke's opinion.

### 2. Dr. Mina Khan's February 6, 2019, Consultative Examination

Dr. Mina Khan conducted a consultative medical examination on February 6, 2019. Gilliland identified neck and back pain as her primary problems. The pain

commenced two to three years earlier, without connection to a specific injury. Gilliland also reported a diagnosis of degenerative disc disease. She received four trigger point injections, which provided short-term relief. Currently, she cannot bend or lift heavy objects, though medications help with her symptoms. She also experiences pain in both knees due to arthritis. Gilliland reported she can ambulate independently, but she always uses a four-pronged cane for support because her knees buckle easily.

Gilliland received a diagnosis of bipolar disorder three to four years before the evaluation, and she receives psychiatric care. Medication fairly controls her psychiatric symptoms. She engages in very limited activity, as she frequently feels depressed and sleeps. Gilliland's daughter handles housework and cooking, but Gilliland sometimes helps with those tasks.

Gilliland reported hospitalizations due to bipolar disorder in 2018 and other hospitalizations in the past. She receives psychiatric treatment, which has sometimes included inpatient admissions. Doctors have diagnosed her with hypertension, well controlled; bipolar disorder; and post-traumatic stress disorder.

During the clinical examination, Gilliland displayed depressed mood and normal neck, eyes, ears, nose, throat, lymph nodes, chest, lungs, cardiovascular system, and abdomen. She displayed no tenderness to palpation over her spine, normal lumbar range of motion, and negative bilateral straight leg raise test. She displayed limited range of motion in both shoulders, both knees, and the lumbosacral spine. She presented a normal neurological examination, including awakeness, alertness, full orientation, intact

sensory exam, normal reflexes and gait, negative Romberg's sign, normal fine and gross manipulation, and normal tandem and heel walking.  However, she could not toe walk or push up on her toes.

Dr. Khan assessed Gilliland as experiencing lumbar pain secondary to degenerative disc disease, chronic cervical pain, bilateral knee pain likely secondary to degenerative arthritis, bipolar disorder under the care of a psychiatrist, obesity, and well-controlled hypertension.  She suggested a psychological examination could benefit the disability determination.  (Tr. 1171-74).

The ALJ reviewed Dr. Khan's findings, but she concluded Dr. Khan did not provide a "medical opinion," as Dr. Khan's report did not offer a function-by-function assessment of Gilliland's physical and mental abilities.  Even so, the ALJ considered the report, "along with all other evidence in the aggregate, in determining the claimant's residual functional capacity," and she "also addressed important specific considerations where necessary."  (Tr. 35-36).

The ALJ appropriately observed Dr. Khan's report did not constitute a "medical opinion."  Social Security regulations define a "medical opinion" as:

> a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities:
>
> (i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);

(ii) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;

(iii) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and

(iv) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. § 404.1513(a)(2).  Dr. Khan offered a summary of Gilliland's symptoms, activities, and history of medical treatment, and she conducted a clinical examination. Even so, she offered only diagnoses for Gilliland's conditions.  She did not discuss the functional limitations Gilliland's conditions impose.

As Dr. Khan did not offer a medical opinion pursuant to the regulatory definition, the regulations did not require the ALJ to articulate how persuasive she found Dr. Khan's statement.  *See* 20 C.F.R. § 404.1520c (prescribing requirements only for "medical opinions" and "prior administrative medical findings"); *Megehee v. Kijakazi*, No. 2:20-CV-00735-CWB, 2022 WL 14278116, at *9 (M.D. Ala. Oct. 24, 2022) ("James's conclusory statements do not assess the extent to which Plaintiff can perform any particular function in a work setting and therefore would not constitute a 'medical opinion' under the regulations so as to require a specific articulation of consideration and persuasiveness.").  Accordingly, the ALJ did nor err in considering Dr. Khan's opinion.

### 3.      Dr. Thomas A. Amason's June 7, 2019, Assessment

On June 7, 2019, Dr. Thomas A. Amason conducted a Physical Residual Functional Capacity Assessment at the state agency level.  He opined Gilliland could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk six hours in an eight-hour workday, sit six hours in an eight-hour workday, and perform unlimited pushing and pulling movements.  She could frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; balance without limits; and occasionally stoop, kneel, crouch, and crawl.  Gilliland's limitations resulted from her degenerative disc disease and degenerative joint disease.

Gilliland could frequently reach, and she could perform unlimited handling, fingering, and feeling.  She experienced no visual or communicative limitations.  She should avoid concentrated exposure to hazards such as machinery or heights, but she experienced no limitation of her ability to tolerate extreme cold or heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, or poor ventilation.  (Tr. 133-35).

The ALJ found Dr. Amason's assessments partly persuasive.  While Dr. Amason assessed work at the light exertional level, the ALJ further limited Gilliland to the sedentary exertional level to accommodate Gilliland's alleged symptoms.  The ALJ also included additional non-exertional limitations, such as occasional climbing of ramps and stairs; occasional reaching; frequent handling, fingering, and feeling; and no exposure to machinery, heights, cold, or vibration.  (Tr. 37).

As the ALJ imposed additional limitations in her RFC finding that favor

Gilliland's position, Gilliland offers no substantive argument that the ALJ erroneously considered Dr. Amason's opinion.  After a review of the record, the court also finds the ALJ properly considered Dr. Amason's opinion only partly persuasive, and substantial evidence supports the ALJ's decision.

### 4.    Dr. Michael Manes's December 19, 2019, Statement

Dr. Michael Manes, Gilliland's primary care doctor at Vencentian Physician Services, submitted a statement on December 19, 2019.  Dr. Manes checked boxes indicating he would expect Gilliland to miss more than three days of work each month due to her medical condition, and Gilliland will "experience symptoms, on a chronic basis, from her underlying medical condition(s) which could reasonably be expected to cause distraction from job tasks, or result in a failure to complete job tasks in a timely manner, for more than two hours during a typical eight hour workday." (Tr. 1943).  He also stated Gilliland could not sustain work for eight hours a day, five days a week, even if seated most of the day, due to degenerative disc disease of her cervical and lumbar spine that progresses despite medication and physical therapy, and because of bipolar disorder that has required three hospitalizations.  (Tr. 1944).

The ALJ found no evidentiary basis for Dr. Manes's opinion that Gilliland could not complete tasks for more than two hours, and she noted Dr. Manes only checked a box indicating his endorsement of the limitation without providing any additional explanation.  Therefore, Dr. Manes's statement did not persuade the ALJ.  (Tr. 37).

29

As with Dr. Berke, the ALJ properly refuted Dr. Manes's statements about Gilliland's ability to work, as the Commissioner, not the ALJ, makes that assessment. *Walker*, 987 F.3d at 1338-39.

As to the "check-box" nature of Dr. Manes's assessment, Social Security regulations, as discussed, require an ALJ to assess the persuasiveness of a medical opinion based upon the relevancy of the "objective medical evidence and supporting explanations presented by a medical source" to support the opinion. 20 C.F.R. § 404.1520c(c)(1). In 2019, the Eleventh Circuit declared an ALJ should not discount a physician's opinion solely based upon the format in which the physician expresses the opinion. *Schink*, 935 F.3d at 1262 ("The most that can be said in criticism of the questionnaires' format is that they used a 'check box' format with limited space for explanation of the assessments. But that is not a basis, in and of itself, to discount them as conclusory."). Rather, the ALJ should evaluate a physician's "answers to the questionnaires in light of their treatment notes." *Id.*

The Eleventh Circuit decided *Schink* under the now-defunct rule requiring an ALJ to afford deference to opinions of a claimant's treating physician, and the court's research revealed no definitive answer whether the Eleventh Circuit's statements about the summary nature of a physician's assessment should apply under the revised regulations governing opinion evidence. This court need not reach that determination today, as considering Dr. Manes's check-box statements in the context of his treatment notes does not undermine the ALJ's finding regarding the persuasiveness of Dr.

Manes's opinions.

Dr. Manes's notes, as summarized earlier in this opinion, reflect Gilliland consistently complained of back pain, yet Dr. Manes did not render any negative clinical findings regarding Gilliland's physical functioning until June 25, 2019, more than a year after Gilliland's alleged disability onset date, and he did so only after Gilliland requested his assistance in obtaining disability benefits.[6]  Even then, Dr. Manes included clinical findings of reduced speed in sitting on and arising from the examination table, limited neck range of motion, 4/5 bilateral lower extremity muscle strength, and positive straight leg tests.  Dr. Manes never reported any gait disturbance or limited range of motion in any other joints.  Those findings support the presence of some spinal and joint pain, and some resulting limitations from that pain, but they do not provide substantial support for Dr. Manes's conclusion that Gilliland would miss more than three days of work each month, could not perform even seated work, and would experience distraction from job tasks more than two hours each day.  Accordingly, even if the ALJ had considered the check-box nature of Dr. Manes's assessment in conjunction with Dr. Manes's treatment notes, her decision to find Dr. Manes's

---

[6] The court observes that the ALJ did not explicitly discuss any of Dr. Manes's notes after January 2019, though she did discuss other medical records addressing Gilliland's spinal condition after that date.  (Tr. 25-28).  However, the ALJ does not need to discuss every piece of evidence in the record as long as her decision portrays she considered Gilliland's medical condition as a whole. *Lewen v. Comm'r of Soc. Sec.*, 605 F. App'x 967, 968 (11th Cir. 2015) (citing *Dyer v. Barnhart,* 395 F.3d 1206, 1211 (11th Cir. 2005)).  Regardless, even if the ALJ erred by failing to discuss Dr. Manes's other records, the error presents as harmless, as the remaining records did not undermine the ALJ's decision to find Dr. Manes's assessment less than fully persuasive.

assessment unpersuasive would have enjoyed substantial evidentiary support.

The remainder of the medical evidence, explicated fully above, also provides substantial evidentiary support for the ALJ's decision not to fully credit Dr. Manes's assessment. As with Dr. Berke, some evidence may have supported Dr. Manes's opinions that Gilliland would miss more than three days of work each month, her symptoms would distract her from work activities more than two hours a day, and she could not sustain work activity on a continual basis. But substantial evidence supports the ALJ's decision to find Dr. Manes's assessments less than fully persuasive. The ALJ did not err in considering Dr. Manes's assessment.

### B. The ALJ Did Not Appropriately Consider Medical Opinions Addressing Gilliland's Mental and Psychological Functioning

#### 1. June Nichols, Psy.D.'s January 29, 2019, Consultative Examination

On January 29, 2019, June Nichols, Psy.D., conducted a consultative evaluation and rendered a report. Gilliland reported experiencing sudden anxiety and hearing voices telling her to "get out" because someone wants to hurt her. She underwent two hospitalizations at Trussville Hospital, and she continues to undergo counseling with Grayson and Associates. She has received diagnoses of depression and bipolar disorder, and her medications benefit her. She experiences low energy and unsafe feelings around other people. She reported a history of childhood sex abuse and underage drinking.

During the examination, Gilliland presented as neat and clean, with fair eye contact and normal, clear speech. She displayed depressed mood, congruent with her

thought processes, and tearful affect. She described trouble sleeping due to racing thoughts, good appetite, decreased energy, anhedonia, and crying episodes, but she denied suicidal or homicidal ideation. She displayed clear stream of consciousness, full orientation, good mental processing speed, intact recent and remote memory, adequate fund of knowledge, abstract thought patterns, normal thought processes, good judgment and insight, and average intelligence. She did not demonstrate any hallucinations, delusions, ideas of reference, response to internal psychotic processes, obsessions, or compulsions; however, she reported panic attacks, negative responses to anyone approaching her from behind, flashbacks and nightmares about childhood abuse, and memory lapses from childhood.

Gilliland's daily activities include lying on a couch, crying, eating, and returning to bed. Her husband performs most household tasks, but she helps with cooking and cleaning. Her sleep schedule varies, and nightmares interrupt her sleep. She eats one or two meals each day. She does not attend church, have friends, or participate in any community activities.

Dr. Nichols assessed Gilliland as experiencing Bipolar I Disorder, depressed, severe with psychotic features; panic disorder; and post-traumatic stress disorder. She assessed a guarded prognosis for significant improvement over the subsequent twelve months. Though Gilliland works with her psychiatrist to improve her stability, she spends the majority of her time lying around the house and crying. (Tr. 1166-68).

Dr. Nichols assessed that Gilliland

33

> appeared able to understand instructions, but would have difficulty
> remembering them to carry them out.  She is unable to sustain
> concentration and persist in a work relate[d] activity at a reasonable pace.
> She is unable to maintain effective social interaction on a consistent and
> independent basis with supervisors, coworkers, and the public.  She is
> unable to deal with normal pressures in a competitive work setting.  She
> is able to manage her own funds.

(Tr. 1169).

Dr. Nichols' assessment did not persuade the ALJ, because "[w]hen the claimant is taking her medications as prescribed, the claimant improved and does not have marked limitations . . . ."  (Tr. 35).

### 2.    Dr. Robert Estock's February 15, 2019, and June 11, 2019, Assessments, and Dr. Robert Campion's March 12, 2019, Statements

Dr. Robert Estock, an agency medical consultant, reviewed Gilliland's records and rendered psychiatric assessments on two occasions.

On February 15, 2019, after considering Dr. Nichols' January 29, 2019, assessment and Gilliland's October 27, 2018, and November 28, 2018, treatment records from Grayson & Associates, Dr. Estock concluded Gilliland suffered marked impairment of her abilities to understand, remember, and apply information; interact with others; and concentrate, persist, and maintain pace.  She suffered moderate impairment of her ability to adapt or manage herself.

Dr. Estock also completed a Residual Functional Capacity Assessment, wherein he assessed Gilliland suffered marked limitation of her abilities to:  remember locations and work-like procedures; understand, remember, and carry out detailed instructions;

maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  She suffered moderate limitation of her abilities to:  understand, remember, and carry out very short and simple instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.  She suffered no significant limitation of her abilities to maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places, or use public transportation.  (Tr. 111-16).

Dr. Estock's February 2019 opinion did not persuade the ALJ, as Gilliland's psychiatric records described her as alert and fully oriented, with clear speech, good judgment and insight, normal mood, normal affect, normal cognition, normal attention span and concentration, and normal ability to respond to commands.  Gilliland denied hallucinations and delusions to her medical providers.  In May 2018, she reported good

progress in her mental condition, and in several records, she reported good results from

her medication.  (Tr. 36).

The Social Security Administration's Office of Quality Review (OQR)[7]

---

[7] According to the Social Security Administration's Organizational Manual, the Office of Quality Review (OQR)

> reviews, evaluates, and reports on the integrity and quality of the administration of Social Security programs in headquarters and in the field.  The Office conducts broad-based reviews, studies, and analyses of agency operations with emphasis on compliance with laws, regulations, and policies.  The Office also establishes quality review policy for the OARO field reviewers, analyzes and reports on results, and recommends changes in programs, policies, or legislation aimed at quality and productivity improvement and program simplification.  The Office assesses the medical determinations made by the State and Federal disability determination components and decisions by the Office of Hearings Operations, including decisions by Senior Attorney Advisors and Administrative Law Judges.  The Office evaluates the quality of the agency's operations with emphasis on the prevention of program and systems abuse, the elimination of waste, and the increase of efficiency.  The Office also performs customer surveys that measure the public's perceptions of the agency's service delivery and provides insights for agency planning.  The Office leads the development and maintenance of the quality assurance systems that support nationwide studies and reviews.

https://www.ssa.gov/org/orgOARO.htm#oqr, § III(G) (last visited August 29, 2023).

According to the Administration's Program Operations Manual System (POMS), the OQR "reviews sample cases to ensure the evidentiary record supports the determination and that the evidence and the determination conform to SSA operating policies and procedures." SSA POMS GN 04440.002(B).

> An automated selection process selects quality review sample cases, when adjudicating components input determinations, and sends cases to review components prior to effectuation of the determinations.

> Quality reviewers review adjudicating components' determinations using the same policy and procedural guidelines adjudicating components use. Quality reviewers follow the steps of sequential evaluation and consider all available evidence when assessing policy compliance, sufficiency of evidence, and determination accuracy.

*Id.* If the reviewer finds a deficiency, the OQR "may return a deficient case to an adjudicating component when correcting the deficiency could affect the disability determination . . . ." *Id.* GN

conducted a review of Gilliland's file, including Dr. Estock's February 15, 2019, assessment.  (Tr. 102-18).  As part of that review, on March 12, 2019, Dr. Robert Campion, an OQR staff member, concluded the evidence did not suffice to assess the severity of Gilliland's mental impairments.  He also noted Gilliland did not report hallucinations or other psychotic symptoms in psychiatric records from April, May, July, and October 2018, and a February 6, 2019, medical consultative evaluation characterized her bipolar symptoms as well-controlled.  Neither she nor her husband reported such symptoms in her function report.  Moreover, though Gilliland reported hallucinations to Dr. Nichols in January 2019, she did not specify when the hallucinations occurred, and Dr. Nichols stated Gilliland did not appear to respond to internal stimuli.

Dr. Campion considered Dr. Estock's February 15 assessment to lack support, reasoning as follows:

> [Disability Determination Services (DDS)] rated the evidence as consistent, although this is contradicted by the lack of [treating source medical evidence] documenting hallucinations.  Moreover, DDS rated the [claimant] as marked[ly] impaired in three areas on the [Psychiatric Review Technique (PRT)] yet went on to complete a [Mental Residual Functional Capacity (MRFC) assessment].  This is also inconsistent.  In any case, the psych allowance appears to be based mainly on the [consultative examination (CE)], but there is a substantive basis to doubt the accuracy of information provided by the [claimant] at the CE.  There is reference to two prior hospitalizations at Trussville.  It is unclear if these were medical or psych admissions.  In either case, observations during

---

04440.002(D).  Among other circumstances, a deficiency exists "when the evidence in file is insufficient to make a policy compliant determination and the file is not documented in accordance with SSA disability policy."  *Id.* GN 04440.003(C)(1).

> hospitalizations often provide a clearer picture of the [claimant's] clinical
> condition insofar as she was observed continuously as opposed to the
> hour or so spent at a CE. Therefore, we should request the Trussville
> hospital records. DDS should also be asked to explain the assessment of
> consistency on the Symptom Evaluation section, given the inconsistencies
> cited above.

(Tr. 110). Dr. Campion signed his statement as "Robert Campion, M.D.," identified

the Medical Special Code (37) for psychiatry, and located his signature under the

heading for an "MC/PC or SDM Signature." (*Id.*). Dr. Campion also affixed the same

signature under the same heading at the conclusion of the Commissioner's March 12,

2019, Disability Determination Explanation. (Tr. 118).

The ALJ did not explicitly mention any of Dr. Campion's comments or findings.

On March 22, 2019, based on Dr. Campion's recommendation, OQR issued a

Request for Corrective Action, as the evidence did not suffice to assess the severity of

Gilliland's mental condition. The examiner requested copies of records from Gilliland's

more recent hospitalizations and updated treatment source notes, and she directed SSA

to conduct a revised assessment after receipt of those additional records. (Tr. 326-27).

The Request for Corrective Action Form listed Dr. Campion as the "Medical

Reviewer." (Tr. 326).

On June 11, 2019, Dr. Estock conducted a revised assessment after considering

the updated medical records. In assessing whether Gilliland met or equaled a listing,

Dr. Estock opined she experienced moderate limitation in her abilities to understand,

remember, and apply information; interact with others; concentrate, persist, or maintain

pace; and adapt or manage herself. (Tr. 129). He also found Gilliland's statements regarding her symptoms partially consistent with the record evidence. He expected Gilliland's impairments to produce the type of symptoms and functional limitations of which she complained, but the objective evidence did not fully support Gilliland's statements about the severity of her limitations. (Tr. 133).

In an updated Mental Residual Functional Capacity Assessment, Dr. Estock did not assess any marked limitations. He opined that Gilliland would experience moderate limitation of her abilities to remember locations and work-like procedures; understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. She experienced no significant limitation of her abilities to understand, remember, and carry out very short and simple instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; maintain socially appropriate behavior and adhere to basic standards

of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals and make plans independently of others.

Because of her limitations, Dr. Estock opined Gilliland can understand and remember short, simple instructions and tasks, but she would likely experience difficulty with more detailed tasks and instructions. She can carry out short, simple instructions, but possibly not more detailed ones. She can maintain attention and concentration for two hours with customary rest breaks, but she would need a well-spaced work environment to maximize her concentration. She would likely miss one to two days of work each month due to psychological symptoms. She should experience only infrequent and non-intensive contact with the public, and she should receive only tactful, constructive, non-threatening supervision. She can tolerate gradual, infrequent workplace changes. (Tr. 135-37).

Dr. Estock's June 2019 assessments of Gilliland's satisfaction of the mental health listing requirements generally persuaded the ALJ, but Dr. Estock's mental residual functional capacity assessment did not as strongly persuade the ALJ, as Dr. Estock did not phrase the limitations in vocationally relevant terms, and the limitations did not pertain to vocational descriptions in the Dictionary of Occupational Titles. (Tr. 36-37).

3. **Angelle Taylor's February 4, 2020, Mental Residual Functional Capacity Questionnaire**

On February 4, 2020, Angelle Taylor, LPC, Gilliland's counselor at Grayson and Associates, completed a Mental Residual Functional Capacity Questionnaire. She indicated Gilliland suffered marked restriction of her daily living activities, marked difficulty in maintaining social functioning, and marked deficiencies of concentration, persistence, or pace, resulting in the failure to complete tasks in a timely and appropriate manner at work. She would experience four or more episodes of decompensation in work or work-like settings that would cause her to withdraw from the situation or to experience exacerbation of her symptoms.[8] She also experienced marked impairment of her abilities to understand, carry out, and remember instructions; respond appropriately to supervision, co-workers, and customary work pressures; and perform complex or detailed tasks. She suffered moderate impairment of her ability to perform simple or repetitive tasks. Gilliland's limitations lasted or could be expected to last for at least 12 months; indeed, they commenced in 2001. (Tr. 2176-80).

Taylor opined that Gilliland would: (1) "experience symptoms, on a chronic basis, from [her] underlying medical condition(s) which could reasonably be expected to cause distraction from job tasks, or result in a failure to complete job tasks in a timely manner, for more than two hours during a typical 8 hour workday"; (2) miss more than three days of work each month because of her condition; and (3) "not sustain work for

---

[8] The assessment did not state the time period during which these episodes would occur.

eight (8) hours per day, five (5) days per week at any kind of job, even one that is seated most of the day." (Tr. 2180).

Taylor's assessment did not persuade the ALJ, as the ALJ considered the marked restrictions Taylor imposed "clearly excessive and not supported by the record," which had "shown that when the claimant is compl[ia]nt with taking her psychiatric medications her symptoms are fairly well controlled." (Tr. 38).

> **4.    The Court Will Remand as the ALJ Failed to Discuss Dr. Campion's Administrative Finding, and the Court Cannot Adequately Assess Whether the ALJ's Decision About Gilliland's Mental Impairments Enjoyed Substantial Evidentiary Support**

Gilliland argues the ALJ erred by not discussing Dr. Campion's assessment. Ultimately, the court agrees, but other issues merit assessment preliminarily. As an initial matter, Gilliland incorrectly attributes to Dr. Campion a March 12, 2019, administrative finding that her onset date of disability occurred October 29, 2018 (which falls three months before Dr. Nichols's January 29, 2019, mental status exam evincing the alleged severity of Gilliland's level of functioning). (Tr. 117).[9]   Based upon the disability review regime and regulations, the record reveals Dr. Campion did not render such a determination.

Pursuant to the Social Security Administration's Program Operations Manual

---

[9] Gilliland's brief states that "[w]hen Dr. Campion reviews the record in March 2019 he concludes that, based on the 'detailed mental status exam' of Dr. Nichols and his review of the record, Ms. Gilliland meets the criteria for disability and remains incapable of sustaining full time work." (Doc. 12, at 21).

System (POMS), medical and psychological consultants (MC's or PC's) such as Dr. Campion bear responsibility for evaluating the sufficiency of evidence and assessing the severity of a claimant's impairments, the satisfaction of any listings, and the claimant's RFC.  SSA POMS DI 24501.001(B)(3).  MC's and PC's do not assess the effects of a claimant's RFC on her ability to perform work, nor do they prepare the disability determination: rather, a disability examiner (DE) performs those functions.  *Id.*, DI 24501.001(B)(1).  *See also Martinez v. Kijakazi*, No. 8:20-CV-1025-TPB-AEP, 2021 WL 4482616, at *14 (M.D. Fla. Aug. 23, 2021), *report and recommendation adopted*, No. 8:20-CV-1025-TPB-AEP, 2021 WL 4478248 (M.D. Fla. Sept. 30, 2021) (citing SSA POMS DI 24501.001(B)(1)(d)(1)-(2)) ("[T]he Explanations of Determination are prepared by disability examiners."); *Cassady v. Kijakazi*, No. 21-82179-CV, 2023 WL 2432338, at *10 (S.D. Fla. Feb. 21, 2023), *report and recommendation adopted*, No. 21-82179-CV, 2023 WL 2429232 (S.D. Fla. Mar. 9, 2023) (citing SSA POMS DI 24501.001(B)(1)(d)(1)-(2)) ("The Explanations of Determination Mr. Cassady argues the ALJ should have considered were prepared by state agency disability examiners.").

Thus, Dr. Campion did not offer an opinion that Gilliland suffered a disability.[10] Indeed, such an opinion would contradict Dr. Campion's assessment that the record as

---

[10] The record clearly identifies Dr. Campion as "MC/PC," the same designation the Commissioner assigned to Dr. Estock.  (Tr. 110, 113, 116, 118).  The Commissioner assigned both doctors the same Medical Specialty Code, 37, for psychiatry.  *See* SSA POMS DI 24501.004(B) (May 5, 2015). Thomas Broderick, a OQR Reviewer, also signed the disability determination, indicating Broderick conducted the administrative disability determination, while Drs. Campion and Estock performed medical assessments.  (Tr. 118).

of March 2019 lacked sufficient evidence to adequately assess Gilliland's mental limitations.

Because the DE, not Dr. Campion, rendered the assessment of Gilliland's vocational abilities in light of her RFC, the ALJ did not need to explicitly discuss the DE's assessment.  Pursuant to Social Security regulations, a DE's findings about medical or vocational issues, or about the ultimate disability determination, stand "inherently neither valuable nor persuasive" to the issue of a claimant's disability, and the ALJ "will not provide any analysis about how [she] considered such evidence in [her] determination or decision."  20 C.F.R. § 404.1520b(c)(2); *see also Martinez*, 2021 WL 4482616, at *14 ("[T]he ALJ was not required to address the Explanations of Determination in rendering the decision as such evidence was neither valuable nor persuasive to determining whether Plaintiff maintained the ability to perform her past work.").

Dr. Campion also did not offer a "medical opinion" that triggered 20 C.F.R. § 404.1520c(b)(2)'s requirement that the ALJ explain how she considered the supportability and consistency of the opinion.  Under the regulatory definition quoted above, 20 C.F.R. § 404.1513(a)(2), Dr. Campion did not offer an assessment of Gilliland's abilities to perform the physical, mental, and other demands of work, or to adapt to environmental conditions.  Rather, he concluded the record did not contain sufficient evidence to perform those assessments.  *See Bartlett v. Kijakazi*, No. CV421-067, 2022 WL 4350437, at *4 (S.D. Ga. Aug. 30, 2022), *report and recommendation adopted*,

No. CV421-067, 2022 WL 4349049 (S.D. Ga. Sept. 19, 2022) (physician's report that recited the claimant's medical history, the results of a physical examination, the results of diagnostic testing, the physician's impressions, and his judgment about the claimant's range of motion did not constitute a medical opinion, as it did not contain a statement about what the claimant could still do despite her impairments).[11]

However, Dr. Campion's assessment constitutes a "prior administrative medical finding," which comprises

> a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 404.900) in your current claim based on their review of the evidence in your case record, such as:
>
> (i) The existence and severity of your impairment(s);
>
> (ii) The existence and severity of your symptoms;
>
> (iii) Statements about whether your impairment(s) meets or medically equals any listing in the Listing of Impairments in Part 404, Subpart P, Appendix 1;
>
> (iv) Your residual functional capacity;

---

[11] Dr. Campion may have offered "other medical evidence," which comprises "evidence from a medical source that is not objective medical evidence or a medical opinion, including judgments about the nature and severity of your impairments, your medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis." 20 C.F.R. § 404.1513(a)(3). To wit, Dr. Campion proffered observations about Gilliland's medical history, clinical findings, and diagnoses. Nevertheless, the regulations do not require an ALJ to evaluate and discuss the persuasiveness of other medical evidence. *See B.S.G. v. Comm'r of Soc. Sec.*, No. 720CV157WLSTQL, 2022 WL 1286228, at *6 (M.D. Ga. Mar. 4, 2022) (ALJ is "not required to specifically state whether she found [a doctor's] notations regarding manipulative functions [*i.e.*, other medical evidence] persuasive or not persuasive or provide a reasoned explanation for discounting them."); *Dye v. Comm'r of Soc. Sec.*, No. 5:20-CV-459-NPM, 2022 WL 970186, at *4 (M.D. Fla. Mar. 31, 2022) (ALJ must consider all medical evidence, but she does not need to assess the persuasiveness of "other medical evidence.").

(v) Whether your impairment(s) meets the duration requirement; and

(vi) How failure to follow prescribed treatment (see § 404.1530) and drug addiction and alcoholism (see § 404.1535) relate to your claim.

20 C.F.R. § 404.1513(a)(5).

The record consistently identifies Dr. Campion as either a medical or psychological consultant at the administrative level. (Tr. 110, 118). Moreover, Dr. Campion evaluated the existence and severity of Gilliland's impairments and symptoms, and he rendered his evaluation, based upon his review of the record, at a prior level of review in Gilliland's current claim. Therefore, Dr. Campion's statement qualifies as a "prior administrative medical finding," and it triggered the ALJ's obligation pursuant to 20 C.F.R. § 404.1520c to discuss the persuasiveness of the finding.[12] As the ALJ did not do so, she did not satisfy applicable legal requirements.

The ALJ's omission bears significance. First, Dr. Campion's review led Dr. Estock to conduct a second assessment of Gilliland's file, and to render a revised functional assessment. Dr. Estock's first assessment included disabling impairments –

---

[12] Other regulatory provisions cast the findings of state agency medical and psychological consultants as "prior administrative medical findings." *See* 20 C.F.R. § 404.1513a(b)(1) ("Administrative law judges are responsible for reviewing the evidence and making administrative findings of fact and conclusions of law. They will consider prior administrative medical findings and medical evidence from our Federal or State agency medical or psychological consultants as follows: (1) Administrative law judges are not required to adopt any prior administrative medical findings, but they must consider this evidence according to §§ 404.1520b, 404.1520c, and 404.1527, as appropriate, because our Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation.").

even listing-level impairments – but his second assessment paints an ambiguous picture. The second assessment includes mostly moderate limitations, but it also includes an expectation that Gilliland would miss one to two days of work each month, which would preclude employment, as the VE testified employers typically do not tolerate more than ten to 12 absences each year.  (Tr. 72-73).  *See Samuels v. Acting Comm'r of Soc. Sec.,* 959 F.3d 1042, 1047 (11th Cir. 2020) (RFC finding incomplete because it did not account for unexcused absences or time spent off-task as a result of the claimant's bipolar disorder).  The record contains no explanation for Dr. Estock's significant change in his opinion between February and June of 2019, other than Dr. Campion's intervening review.

Even more significant, the ALJ found Dr. Estock's second assessment generally persuasive, other than limitations the ALJ did not phrase in "vocationally relevant terms."  (Tr. 36).  The ALJ did not specify which of Dr. Estock's limitations eschewed "vocationally relevant terms," but frequent absences from work clearly would not fall within that category, as attendance directly affects employability, according to the VE's testimony.  Yet the ALJ did not explain why Dr. Estock's assessment of one to two absences each month would not prevent Gilliland from working.

An ALJ errs when she fails to consider the episodic nature of a claimant's impairments, including mental conditions like bipolar disorder, for which Gilliland received a diagnosis.  *See Samuels,* 959 F.3d at 1047 (ALJ erred by not including the potential for a bipolar claimant's absences of work or time spent off-task in the

hypothetical question to the vocational expert); *Torres v. Kijakazi*, No. 1:21-CV-20037-JLK, 2022 WL 4000797, at *12 (S.D. Fla. Aug. 15, 2022), *report and recommendation adopted*, No. 1:21-CV-20037, 2022 WL 3975121 (S.D. Fla. Sept. 1, 2022) ("Given the requirement that an RFC analysis contemplate mental limitations, the ALJ's finding is not supported by substantial evidence, since he fails to explain whether or how the limitation of potential absences was considered in Plaintiff's RFC").   Absent an explanation of the ALJ's consideration of Dr. Campion's review, the court cannot adequately assess whether the ALJ's decision regarding Gilliland's mental impairments enjoys substantial evidentiary support.   These circumstances warrant remand for the ALJ to reconsider the evidence regarding Gilliland's mental health impairments, articulate how persuasive he found Dr. Campion's evaluation, discern and articulate any possible explanation for the discrepancies between Dr. Estock's two assessments, and address the vocational significance of the episodic nature of Gilliland's mental impairments, including Dr. Estock's prediction regarding Gilliland's work absences.

## III.   The Court Will Remand the Case for Further Consideration of Gilliland's Satisfaction of Listings 12.04 and 12.15

To meet the requirements of a listing, Gilliland must "have a medically determinable impairment(s) that satisfies all of the criteria in the listing." 20 C.F.R. § 404.1525(d).   The listings identify impairments so severe as to prevent a person from engaging in gainful activity. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.   If a claimant contends an impairment equals a listed impairment, the claimant must present evidence

that describes how the impairment possesses such an equivalency. *Armstrong v. Comm'r of Soc. Sec.*, 546 F. App'x 891, 894 (11th Cir. 2013) (citing *Wilkinson ex rel. Wilkinson v. Bowen*, 847 F. 2d 660, 662 (11th Cir. 1987)); *see also Garcia v. Comm'r of Soc. Sec.*, 833 F. App'x 303, 307 (11th Cir. 2020) (citing *Barron v. Sullivan*, 924 F.2d 227, 229 (11th Cir. 1991)) ("The claimant bears the burden of demonstrating that she meets a Listing."). If the claimant meets a listed impairment or otherwise establishes an equivalence, the regulations conclusively presume a disability. *See* 20 C.F.R. § 404.1520(d).   If an impairment manifests only some of the criteria, then it does not qualify, no matter how severe the impairment. *Nichols v. Comm'r of Soc. Sec.*, 679 F. App'x 792, 795 (11th Cir. 2017) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990), *superseded by statute on other grounds as stated in Colon v. Apfel*, 133 F. Supp. 2d 330, 338-39 (S.D.N.Y. 2001)).

Gilliland argues she experiences mental impairments that meet or equal Listings 12.04 and 12.15.  Both of those listings require satisfaction of A, B, and C criteria.  The two listings share the same B and C criteria, but their A criteria differ.

Listing 12.04, which establishes the criteria for depressive, bipolar, and related disorders, describes such conditions as

> characterized by an irritable, depressed, elevated, or expansive mood, or by a loss of interest or pleasure in all or almost all activities, causing a clinically significant decline in functioning. Symptoms and signs may include, but are not limited to, feelings of hopelessness or guilt, suicidal ideation, a clinically significant change in body weight or appetite, sleep disturbances, an increase or decrease in energy, psychomotor abnormalities, disturbed concentration, pressured speech, grandiosity, reduced impulse control, sadness, euphoria, and social withdrawal.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(B)(3)(a).

The A criteria of the listing requires proof of:

Medical documentation of the requirements of paragraph 1 or 2:

> 1. Depressive disorder, characterized by five or more of the following:
>
>> a. Depressed mood;
>> b. Diminished interest in almost all activities;
>> c. Appetite disturbance with change in weight;
>> d. Sleep disturbance;
>> e. Observable psychomotor agitation or retardation;
>> f. Decreased energy;
>> g. Feelings of guilt or worthlessness;
>> h. Difficulty concentrating or thinking; or
>> i. Thoughts of death or suicide.
>
> 2. Bipolar disorder, characterized by three or more of the following:
>> a. Pressured speech;
>> b. Flight of ideas;
>> c. Inflated self-esteem;
>> d. Decreased need for sleep;
>> e. Distractibility;
>> f. Involvement in activities that have a high probability of painful consequences that are not recognized; or
>> g. Increase in goal-directed activity or psychomotor agitation.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.04(A).

Listing 12.15 describes "[t]rauma- and stressor related disorders" as

disorders . . . characterized by experiencing or witnessing a traumatic or stressful event, or learning of a traumatic event occurring to a close family member or close friend, and the psychological aftermath of clinically significant effects on functioning. Symptoms and signs may include, but are not limited to, distressing memories, dreams, and flashbacks related to the trauma or stressor; avoidant behavior; diminished interest or participation in significant activities; persistent negative emotional states

(for example, fear, anger) or persistent inability to experience positive emotions (for example, satisfaction, affection); anxiety; irritability; aggression; exaggerated startle response; difficulty concentrating; and sleep disturbance.

20 C.F.R. 404, Subpt. P, App. 1, Pt. A2 § 12.00(B)(11).

The A criteria of Listing 12.15 require medical documentation of:

1. Exposure to actual or threatened death, serious injury, or violence;

2. Subsequent involuntary re-experiencing of the traumatic event (for example, intrusive memories, dreams, or flashbacks);

3. Avoidance of external reminders of the event;

4. Disturbance in mood and behavior; and

5. Increases in arousal and reactivity (for example, exaggerated startle response, sleep disturbance).

20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.15(A).

As discussed, both listings require the same B and C criteria:

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F)[13]:

1. Understand, remember, or apply information (see 12.00E1).[14]
2. Interact with others (see 12.00E2).[15]

---

[13] A claimant experiences marked limitation when her "functioning in [an] area independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(d). She experiences extreme limitation when she is "not able to function in [an] area independently, appropriately, effectively, and on a sustained basis." *Id.* § 12.00(F)(2)(e).

[14] The ability to understand, remember, or apply information "refers to the abilities to learn, recall, and use information to perform work activities." *Id.* § 12.00(E)(1).

[15] The ability to interact with others "refers to the abilities to relate to and work with supervisors, co-workers, and the public." *Id.* § 12.00(E)(2).

      3. Concentrate, persist, or maintain pace (see 12.00E3).[16]
      4. Adapt or manage oneself (see 12.00E4).[17]

OR

C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:

      1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and
      2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

*Id.* §§ 12.04, 12.15.

The ALJ did not assess whether Gilliland satisfied the A criteria of either listing, as she concluded Gilliland failed to satisfy the B and C criteria. She concluded, consistent with Dr. Estock's June 11, 2019, assessment, that Gilliland did not satisfy the B criteria because she experienced only moderate impairment of her abilities to understand, remember, and apply information; interact with others; concentrate, persist, or maintain pace; and adapt and manage herself. (Tr. 21-22). Gilliland did not satisfy the C criteria because, though Gilliland "may reasonably have some difficulty in adjusting or adapting to change on a persistent basis, the evidence of record does not

---

[16] The ability to concentrate, persist, or maintain pace "refers to the abilities to focus attention on work activities and stay on task at a sustained rate." *Id.* § 12.00(E)(3).

[17] The ability to adapt or manage oneself "refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting." *Id.* § 12.00(E)(4).

support a finding of marginal adjustment and her mental health providers have never reported such . . . ." (Tr. 22).

The correctness of the ALJ's findings pivots upon her assessment of the medical evidence regarding Gilliland's psychological condition. Dr. Estock's first assessment imposed marked impairment in three areas of mental functioning: the abilities to understand, remember, and apply information; interact with others; and concentrate, persist, and maintain pace. Those findings would satisfy the B criteria of Listing 12.04 or Listing 12.15. In contrast, the second assessment imposed only moderate impairment in all areas of mental functioning, which would not satisfy the B criteria of those listings. As discussed in the previous section, Dr. Estock did not explain the differences between his first and second assessments, and the ALJ did not acknowledge the differences. As Dr. Campion's statements may have influenced the change in Dr. Estock's opinion, and the ALJ improperly failed to consider Dr. Campion's statements, the court cannot presently determine whether substantial evidence supported the ALJ's findings that Gilliland did not meet Listing 12.04 or 12.15.

As with the assessment of medical opinions and prior administrative findings, the circumstances warrant remand for further consideration of Gilliland's satisfaction of Listings 12.04 and 12.15, once the ALJ reconsiders the evidence regarding Gilliland's mental health impairments, articulates how persuasive he found Dr. Campion's statements, discerns any possible explanation for the discrepancies between Dr. Estock's two assessments, and addresses the vocational significance of the episodic

nature of Gilliland's mental impairments, including Dr. Estock's prediction regarding Gilliland's work absences.

## CONCLUSION

For the foregoing reasons, the court **REVERSES** the Commissioner's decision and **REMANDS** the case for further consideration of the medical opinions addressing Gilliland's mental impairments, and further assessment of Gilliland's satisfaction of Listings 12.04 and 12.15.

The court will enter a separate final judgment.

**DONE** this 29th day of August, 2023.

HERMAN N. GILLILAND, JR.
UNITED STATES MAGISTRATE JUDGE